**Dr. Frank J. SZARKO, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES and Delaware County Solid Waste Authority, Respondents.**

**DELAWARE COUNTY SOLID WASTE AUTHORITY, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 13, 1995.

Decided Dec. 26, 1995.

Wendy E. Carr, for petitioner Dr. Frank J. Szarko.

David J. Brooman, Robert J. Yarbrough and Paul J. Bruker, Jr., for respondent/petitioner Delaware County Solid Waste Authority.

Before COLINS, President Judge, SMITH, J., and KELTON, Senior Judge.

KELTON, Senior Judge.

Dr. Frank Szarko (Szarko) petitions for review of the November 2, 1994 adjudication of the Environmental Hearing Board (EHB) which sustained in part and dismissed in part his appeal of the issuance of numerous permits by the Department of Environmental Resources (DER) to the Delaware County Solid Waste Authority (the Authority) pertaining to the Authority's solid waste disposal activities at the Colebrookdale Landfill in Earl Township, Berks County. The Authority cross-appeals from the same decision in which the EHB suspended a Dams and Encroachment Waterways Management permit DER issued because DER failed to issue a National Pollution Discharge Elimination System permit (NPDES). We affirm the EHB's decision to dismiss Szarko's appeal regarding the issuance of the solid waste permits and we reverse its decision to suspend the Dams Safety and Waterways Management permit.

## ISSUES

The numerous questions raised in this petition can be grouped into three main issues. First, whether the EHB erred in (1) not suspending the two solid waste permits issued to the Authority for failure to obtain an NPDES permit and (2) suspending the Dams Safety and Waterways Management permit for the same reason. Second, whether the EHB erred in not suspending the solid waste permits for various violations of the Solid Waste Management Act[1] (SWMA) which allegedly resulted in groundwater contamination and erosion and sedimentation control problems at and in the vicinity of the landfill. And third, whether the EHB erred in concluding that the DER did not violate Article I, Section 27 of the Pennsylvania Constitution in its enforcement of the SWMA.

## FACTS

As found by the EHB, in the early 1950s, the Souder dump opened at the present site of the Colebrookdale Landfill. Waste was placed directly on the ground with no provisions to prevent contamination of soil or groundwater. Colebrookdale Builders purchased the site in 1973 and changed the name to Colebrookdale Landfill. Colebrookdale Builders applied for a waste disposal permit and the DER issued Solid Waste Permit No. 100345 in June, 1978. ("1978 permit.") Under this permit, the DER required the owners to install double liners in all new areas of waste disposal and to relocate the old trash to the lined areas. In the 1978 permit, the DER also required the installation of a pipe to convey an unnamed tributary underneath the landfill; the installation of erosion and sedimentation control facilities; the installation of leachate treatment facilities; and the installation of underdrains (piping with holes in it) below the double liners in order to drain away groundwater. Colebrookdale Builders did not implement any of the design safeguards required under the 1978 permit and, in 1981, RRM Corporation purchased the landfill.

In 1981, DER reissued the 1978 permit to the new owners. RRM updated the sediment control and leachate collection facilities and began installing landfill liners for new trash disposal. RRM also began relocating old trash to the lined areas and agreed to relocate one cubic yard of old trash for every eight cubic yards of new trash received. This relocation proceeded slowly.

In 1985, Delaware County Incinerator Authority purchased the stock of RRM Corporation and acquired ownership of the landfill. The Authority changed its name to the Delaware County Solid Waste Authority (the Authority), which is a unit of government and a municipal authority of Delaware County. The Authority operated the landfill as a part of the Delaware County plan for control of waste disposal costs.

On June 21, 1985, the Authority applied for a permit to operate and maintain the existing waterway enclosure, namely a 36″ reinforced concrete pipe (36″ RCP) conveying the unnamed tributary under the landfill liners. In response, the DER issued a Chapter 105 Dam Safety and Waterway Management Permit to the Authority on May 8, 1986. On April 10, 1986, the DER reissued the 1978 permit to the Authority, contingent upon three actions by the Authority:

(1) accelerated relocation of the old dump to the lined areas in the landfill;

(2) a comprehensive study of, and plan for, erosion and sedimentation control of the landfill and installation of a new erosion and sedimentation control system; and

(3) a study of the groundwater in the area of the landfill and the effect of the old dump on the groundwater.

(EHB Adjudication at 9.)

The Authority completed the trash removal effort by April 30, 1988. The Authority commissioned Dr. Thomas Earl, a consulting hydrogeologist, to perform a study of groundwater contamination resulting from the old dump. The Authority also retained Professor Richard C. Warner, Ph.D. to prepare a comprehensive program of erosion and sedimentation control for the landfill. The plan was submitted to the DER, revised and then approved by the DER on September 22, 1986.

---

1. Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.

In August, 1986, the Authority submitted an application for a solid waste permit for expansion of the landfill. This application was denied. Under an agreement between the DER and the Authority, the Authority would apply for two expansion permits, both of which would comply with the new requirements in the 1988 Regulations. On July 1, 1988, the Authority submitted phases I and II of the first application. The DER issued the first solid waste permit on November 16, 1988 ("1988 permit"). This 1988 permit authorized the expansion of the landfill by thirty-two acres and overtopping of thirty-one acres. It is the subject of Dr. Szarko's appeal in EHB Docket No. 88–516–MR.

On September 23, 1988, the Authority submitted phases I and II of the second permit application and the DER issued an additional solid waste permit on December 17, 1990 ("1990 permit"). This permit authorized the expansion of the landfill by sixty-three acres and overtopping by nineteen acres and was the subject of Dr. Szarko's appeal in EHB Docket No. 91–049–MR, which was consolidated into EHB Docket No. 88–516–MR. DER also issued permit No. DO6–476A, a Chapter 105 Dam Safety and Waterways Management permit to abandon the 36″ RCP waterway enclosure and to construct a new pipe to convey the unnamed tributary around the landfill. The DER also issued an Earth Disturbance permit.

Colebrookdale Landfill is located in the western portion of the Township of Earl, Berks County, near its border with the Township of Oley, Berks County. Furnace Run, flowing generally east to west, is immediately south of the landfill. It empties into Manatawny Creek less than a mile downstream from the landfill. The landfill is situated in a steep-sided valley drained primarily by an unnamed tributary of Furnace Run that flows northeast to southwest. Szarko's property is a quarter of a mile from the landfill. He owns property on both sides of Manatawny Creek and 200–300 feet of property upstream of the confluence of the Mana-

tawny Creek and Furnace Run, on both sides of Furnace Run.

Szarko appealed the DER's decision to issue the 1988 permit, the 1990 permit, the Earth Disturbance permit and the Dams Safety and Waterways Management permit. The case was tried before the EHB on stipulated issues. Only those issues, to which both parties stipulated, were properly before the EHB and are properly before us on appeal. After 259 findings of fact, a thirty-six page discussion and twenty-five conclusions of law, the EHB held that the DER should have required the Authority to obtain National Pollution Discharge Elimination System (NPDES) permits for the elimination of the discharges from the 36″ RCP and the underdrain system. Because of the Authority's failure to obtain a NPDES permit, the EHB suspended the Dams Safety and Waterways Management permit, which authorized the abandonment of the 36″ RCP. The EHB upheld the 1988 and 1990 permits on issues related to the eight foot separation between the liner system and the regional groundwater table; pump tests; exclusionary criteria; groundwater and surface water contamination; erosion and sedimentation controls; and Article I, Section 27 of the Pennsylvania Constitution.

Szarko appeals from the EHB's decision not to suspend the 1988 and 1990 solid waste permits, alleging numerous purported violations of the SWMA, the failure to obtain a NPDES permit, and the failure to comply with Article I, § 27 of the Pennsylvania Constitution. The Authority cross-appeals the EHB's decision to suspend the Dams Safety and Waterways Management permit alleging that the EHB erred in requiring that the Authority first obtain a NPDES permit.[2]

**DISCUSSION**

1. *National Pollution Discharge Elimination System Permits*

Szarko's first argument is that the DER erred in issuing the 1988 and 1990 solid

---

2. Our scope of review is limited to determining whether the constitutional rights of the appellant have been violated, whether the necessary findings of fact of the EHB are supported by substan-

tial evidence or whether the decision is contrary to law. *Pawk v. Department of Environmental Resources,* 39 Pa.Cmwlth. 457, 395 A.2d 692 (1978).

waste permits without requiring the Authority to obtain NPDES permits for the discharge of pollutants from the 36″ RCP and the underdrain system. NPDES permits set forth allowable concentrations of pollutants that cannot be exceeded. Szarko argued that the 1988 and 1990 solid waste permits should be suspended. The EHB held that Szarko properly challenged the lack of NPDES permits. It further held that the DER should have required the Authority to apply for the NPDES permits before issuing the 1988 and 1990 permits. The EHB did not suspend the 1988 and 1990 solid waste permits, however, because "(1) the operations under those permits have no impact on the pipes and the discharges, (2) the discharges are not an environmental threat at this time, and (3) suspending landfill operations under these circumstances could pose a much greater environmental threat than the discharges." (EHB Adjudication, at 88.)

The EHB did suspend the Dams Safety and Waterways Management permit (No. DO6–476A), which authorized the abandonment of the 36″ RCP and the rerouting of the unnamed tributary through another piping system. The EHB found that it does impact the discharges. The EHB then remanded that permit to the DER for the issuance of a NPDES permit.

Szarko argues that the EHB erred in not suspending the 1988 and 1990 solid waste permits for failure to obtain NPDES permits. An application for a permit will not be approved unless the applicant affirmatively demonstrates compliance with the requirements of the Solid Waste Management Act, the environmental protection acts and Article I, § 27 of the Pennsylvania Constitution.[3] 25 Pa.Code § 271.201. Without NPDES permits, there is no compliance with The Clean Streams Law.

Szarko rejects the three reasons given by the EHB for not suspending the solid waste permits. First, Szarko argues that continuing under the 1988 and 1990 permits does have an impact on the 36″ RCP and the underdrains by virtue of continuing to land-

fill on top of a contaminated groundwater system which is being conveyed to the surface water, without treatment, by these pipes. Second, he argues that the environmental protection laws prohibiting unpermitted discharges are absolute and do not require the showing of an environmental threat. *See, e.g.,* Clean Water Act, 33 U.S.C. § 1251. Finally, he argues that the EHB did not justify its statement that suspending the landfill operations *could* pose a much greater environmental threat than the discharges. He contends that Berks County has nine other landfills which could be used in lieu of Colebrookdale.

Szarko also argues that the EHB failed to make a finding of unlawful conduct under Section 503(d) of the SWMA. He contends that Section 503(d) requires the DER to deny a permit to any person who has engaged in unlawful conduct; that has not made a showing in the permit application that the violations have been corrected; and that the EHB has no discretion to allow the permit. Szarko argues that the EHB must rescind the 1988 and 1990 solid waste permits until the Authority demonstrates that the unlawful conduct has been corrected.

■ In support of its cross-appeal, the Authority argues that Szarko waived the issue of whether the Authority was required to obtain NPDES permits because it was not among the stipulated issues presented to the EHB. Therefore, it contends that the EHB erred in suspending the Dams Safety and Waterways Management permit. We agree.

This case was tried before the EHB on stipulated issues. Both Szarko and the Authority were bound by the stipulations. *Shapley v. Commonwealth of Pennsylvania,* 150 Pa.Cmwlth. 106, 615 A.2d 827 (1992). The EHB and this Court are also bound by the stipulated issues. *Monroe County Board of Assessment Appeals v. Karlin,* 158 Pa. Cmwlth. 366, 631 A.2d 1062 (1993); *Kershner v. Prudential Insurance Co.,* 382 Pa.Superior Ct. 95, 554 A.2d 964 (1989). None of the

---

**3.** "Environmental protection acts" include The Clean Streams Law. Act of June 22, 1937, P.L.

1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

stipulated issues implicated the absence of NPDES permits.

■ The Authority points out that the *DER* determined that a separate NPDES permit was not required because the levels of contamination exhibited by the 36″ RCP and the underdrains were so low that the solid waste permits the DER issued to the Authority satisfied any need for a NPDES permit. We agree. The water quality requirements of the 1988 and 1990 solid waste permits met the requirements of an NPDES permit. Therefore, a separate NPDES permit would be duplicative and is not required. For these reasons, we affirm the EHB's decision not to suspend the 1988 and 1990 solid waste permits but reverse its decision to suspend the Dams Safety and Waterways Management permit for failure to obtain a NPDES permit.

### 2. *Groundwater contamination*

Szarko argues that the Authority's activities at the landfill site are adversely affecting the regional groundwater at and around the site. His arguments involve four different issues: the eight foot isolation requirement; the exclusionary criteria; pump tests; and liner integrity. We will address each in turn.

#### a. *Eight Foot Isolation*

■ A liner system cannot be constructed unless at least eight feet can be maintained between the bottom of the subbase of the liner system and the regional groundwater table. 25 Pa.Code § 273.252. The EHB held that the design drawings the Authority submitted show that the eight foot separation requirement was met or exceeded throughout the areas to be lined. Therefore, the 1988 and 1990 solid waste permits did not unlawfully approve construction of a liner system where eight feet of separation cannot be maintained.

Szarko argues that the Authority did not and could not affirmatively demonstrate that the groundwater table information submitted to the DER was complete and accurate. He contends that the Authority's expert omitted or discarded the highest recorded measurements in eleven different wells. He further argues that the Authority's understatement of the water table is evidenced by the numer-

ous encounters with water during the construction.

The Authority argues that the EHB's finding that the eight foot isolation will be maintained is supported by substantial evidence. The EHB found that the expert witnesses presented by the Authority were more credible than those presented by Szarko. It is not this Court's role to disturb the EHB's credibility determinations or to re-weigh the evidence. If substantial evidence supports the EHB's findings, we cannot disturb them.

The Authority's expert witness, Dr. Thomas Earl, testified concerning the methods he used to prepare the groundwater contour maps for both the 1988 and 1990 solid waste permits, that the information was complete and accurate and that the requisite separation would be maintained. (N.T. 2529–32, 2551–57, 2574–75, 2609–31, 2671–92.) We find that Dr. Earl's testimony constitutes substantial evidence to support the EHB's finding that the eight foot separation will be maintained.

#### b. *Exclusionary criteria*

■ In relevant part, 25 Pa.Code § 273.202 provides as follows:

(a) Except for areas that were permitted prior to April 9, 1988, a municipal waste landfill may not be operated as follows:

(4) In a valley, ravine, or head of hollow where the operation would result in the elimination, pollution or destruction of a portion of a perennial stream, except that rechanneling may be allowed as provided in Chapter 105 (relating to dam safety and waterway management; . . .)

. . . .

(7) Within 100 feet of a perennial stream.

The 1988 solid waste permit authorized overtopping within one hundred feet of the unnamed tributary, a perennial stream. This would be a violation of the above-cited section if the area were not within the area permitted before April 9, 1988. The EHB held that the entire landfill site was excluded from the above prohibition because it was all permitted prior to April 9, 1988. "Permit area" includes areas "which are or will be

affected by the municipal waste processing or disposal facility." 25 Pa.Code § 271.1. The definition of a "municipal waste disposal or processing facility" includes "land affected during the lifetime of operations, including ... areas where disposal or processing activities occur, support facilities, borrow areas, offices, equipment sheds, air and water pollution control and treatment systems, access roads, ... transportation and storage facilities." 25 Pa.Code § 271.1 Under this definition of "permit area," the areas affected by the 1988 and 1990 solid waste permits were within the permitted areas under the 1978 permit and are exempt.

Szarko disagrees with the EHB's definition of a permit area. He argues that under the 1978 permit, the permitted area was only the 59 acres which made up the disposal area. We disagree.

The EHB correctly concluded that the entire 1988 and 1990 permit areas were part of landfill operations prior to April 9, 1988. Substantial evidence supports this conclusion. According to the aerial photograph of the landfill taken in March, 1988, the areas which were a part of the 1978 permit landfill operations before April 9, 1988 included disposal areas, sediment basins, a leachate tank farm, underdrains, the 36″ RCP, a borrow area, a soil stockpile area, dust control pond, sediment basin 1, a maintenance building, office and scales, and haul roads. (N.T. at 2072–86, 2114–23.) Witness testimony further supports the finding that the entire landfill was permitted prior to April 9, 1988. (N.T. at 2114–20, 4460–61.)

#### c. *Pump tests*

■ Under 25 Pa.Code § 273.115, an application for a permit must contain a description of the geology and groundwater, down to and including the lowest aquifer that may be affected by the landfill. The EHB held that multiple aquifer tests, which are required by this section, were not performed as a part of the submission for the 1988 solid waste permit. The EHB stated that it was not clear whether such tests were of any practical use at this landfill site. It further found that the deficient 1988 pump tests were later cured by a submission made eight months later.

The EHB also concluded that the 1990 solid waste permit was supported by multiple well aquifer tests.

Szarko argues that 25 Pa.Code § 273.115 does not provide that multiple well aquifer tests are only required at sites for which this information will be of practical use; that the DER is required to enforce the regulations literally; that the EHB erred in concluding that the deficient pump tests were cured by the Authority's after-the-fact compliance; and that the pump tests submitted for the 1990 permit did not provide adequate information.

Dr. Earl, the Authority's hydrogeologist, testified regarding the pump tests which he conducted and described why those pump tests met the DER's requirements. He testified that multiple well aquifer tests results have little relevance to the design of a landfill. He further testified that the short-term pumping tests conducted were adequate. (N.T. at 2484–92, 2598–2606, 2692–97.) The EHB made a credibility determination that Dr. Earl was more credible than Dr. John Adams, who testified for Szarko. We may not disturb this credibility determination on appeal. The EHB's decision that the pump tests conducted for the 1988 and 1990 solid waste permits were adequate is based on Dr. Earl's credible testimony. That testimony is substantial evidence to support the EHB's conclusion.

#### d. *Liner breach*

■ Szarko argued before the EHB that the 1978 liner system has been breached and that leachate is escaping and entering into the groundwater system. The EHB held that the groundwater at the landfill has been contaminated for a long time and that there is no direct evidence that the 1978 liners have been breached. It further held that the downward trend in leachate levels is evidence supporting the integrity of the 1978 liner system.

Szarko argues that the EHB's findings are not supported by substantial evidence. Since there can be no direct evidence that the liners have been breached, there is no direct evidence that the liners are intact. Szarko argues that the underdrains have and contin-

ue to show signs of contamination and that the EHB's finding that the levels of contaminants are receding is not supported by substantial evidence.

However, the credible evidence accepted by the EHB showed that the existing contamination is from the old trash dump and not from a liner breach. (N.T. at 2502–3, 2508–20, 4040–4150.) Other expert testimony revealed that the flows observed in leachate detection zones for the 1978 permit were consistent with a tight, well-constructed landfill liner, and were not consistent with a liner breach. (N.T. at 2196–2212.) This credible testimony constitutes substantial evidence to support the EHB's finding that there is no breach in the 1978 liner system.

### 3. Erosion and sedimentation

■ Szarko argued before the EHB that the landfill operations at the site have caused and continue to cause erosion and sedimentation problems despite the Authority's compliance with all of the relevant statutes and regulations. As evidence of these problems, Szarko points to the growth of the delta at Furnace Run and Manatawny Creek. Szarko presented evidence that the delta has grown significantly in size since the Authority purchased the landfill. He also presented evidence that the sedimentation at the delta came from the landfill.

The EHB concluded, however, that the source of the increased sediment at the delta was the construction that took place at the landfill prior to 1984 and that the Authority's activities have made only a minor contribution to the growth of the delta. Aerial photographs proved that the delta existed in 1979, before the Authority acquired the landfill and before the construction of the erosion and sedimentation control system. (N.T. at 54.) Further, the EHB found that aquatic studies show that Furnace Run has good water quality and an absence of significant environmental stress.

Szarko does not seriously contest that the Authority has met all requirements of the relevant statutes and regulations concerning erosion and sedimentation control. See Stipulated Issue 14. In addition, Dr. Richard Warner, a sediment control specialist, ex-plained the erosion and sediment control systems the Authority installed and explained how those systems provide protection far more stringent than required by law. (N.T. at 3555–97.) Robert Blye, an aquatic biologist, testified that biological stream monitoring conducted since 1987 shows that the landfill has no effect on Furnace Run. (N.T. at 4292–323.) We find that substantial evidence supports the EHB's conclusion that the Authority has met all legal requirements for erosion and sedimentation control and that its activities have made only a minor contribution to the growth of the delta.

### 4. Article I, Section 27

■ Article I, section 27 of the Pennsylvania Constitution provides:

> The People have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and aesthetic values of the environment. Pennsylvania Public Natural Resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

EHB noted that compliance with the SWMA constitutes compliance with Article I, § 27. Szarko argued before the EHB that the DER failed to comply with the SWMA and its regulations in issuing the 1988 and 1990 solid waste permits for the all the reasons discussed above. The EHB, however, found that the DER did enforce all of the provisions of the SWMA, except for requiring the Authority to obtain NPDES permits. The EHB then applied the test enunciated in Payne v. Kassab, 11 Pa.Cmwlth. 14, 312 A.2d 86 (1973), and concluded that the benefits of the landfill outweigh the environmental harm.

In his appeal before this court, Szarko reiterates his arguments that the DER failed to enforce the provisions of the SWMA. Specifically, Szarko contends that the Authority did not comply with 25 Pa.Code §§ 271.201(a)(3), 271.201(a)(4) or 273.202. We disagree. As our discussion above indicates, the Authority complied with, and the DER enforced, the provisions of the SWMA.

Thus, the EHB did not commit an error of law in finding that the DER complied with Article I, § 27.

## CONCLUSION

For the reasons stated above, we affirm the order of the EHB dismissing Szarko's appeal of the issuance of the 1988 and 1990 solid waste permits, and the 1990 Earth Disturbance permit. We reverse the order of the EHB which suspended the Dams Safety and Waterways Management permit for failure to obtain an NPDES permit.

## *ORDER*

**AND NOW,** this 26th day of December, 1995, the Adjudications of the Environmental Hearing Board are affirmed in part and reversed in part.

We hereby reverse the Environmental Hearing Board's order suspending the Dams Safety and Waterways Management permit.

In all other issues, we affirm the Environmental Hearing Board.