LEEWARD CONSTRUCTION,
INC., Petitioner,

v.

COMMONWEALTH of Pennsylvania,
DEPARTMENT OF ENVIRONMEN-
TAL PROTECTION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 4, 2002.

Decided Jan. 9, 2003.

Publication Ordered April 2, 2003.

Edward Seglias, Philadelphia, for petitioner.

Paul R. Brierre and Joseph S. Cigan, Wilkes–Barre, for respondent.

BEFORE: COLINS, President Judge, COHN, Judge, and MIRARCHI, JR., Senior Judge.

OPINION BY Senior Judge MIRARCHI.

Leeward Construction, Inc. (Leeward) petitions this Court to review the order of the Environmental Hearing Board (Board) assessing a civil penalty of $258,500 against Leeward for violations of The Clean Streams Law.[1] We affirm.

Leeward is an earthmoving contractor and, in 1997–98, was a subcontractor on a project to develop a site for the construction of a Wal–Mart store in Wayne County. The site is in close proximity to Holbert Creek, adjacent wetlands, and an unnamed tributary to Holbert Creek. Holbert Creek flows for a short distance from the site into the Lackawaxen River. These waterways have been designated "High Quality, Cold Water Fishery, Migratory Fishery Waters," and as such are

entitled to special protection. 25 Pa.Code § 93.9b; Board's Finding of Fact No. 22. The project involved the movement of nearly 900,000 cubic yards of silty soils and other earth immediately adjacent to these protected waters.

In July 1996, the Department of Environmental Protection (Department) issued a National Pollutant Discharge Elimination System (NPDES) permit to Wal–Mart authorizing the discharge of storm water from construction activities at the area where the store will be built (Wal–Mart site). The permit requires the implementation of a Department-approved, site-specific erosion and sediment (E & S) control plan. Sediment-laden runoff is defined as pollution in Section 1 of The Clean Streams Law, 35 P.S. § 691.1.[2] Thereafter, the Department modified the permit to allow for discharge of storm water from construction activities at an adjacent 23-acre parcel known as the Waste site. An E & S plan was also required for this site. Approved E & S plans were developed for both the Wal–Mart and Waste sites, which required the construction and maintenance of numerous E & S controls throughout the sites. Because the Wal–Mart store was to be built on the side of a hill, thousands of yards of material needed to be removed from the Wal–Mart site and taken to the Waste site. Also, rock needed to be taken from a third site, called the Borrow site, to repair a slope at the Wal–Mart site.

Wal–Mart hired Milnes Construction Co. as its general contractor, who in turn hired Leeward to conduct earth work at the sites. Leeward became a co-permittee un-

1. Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

2. The Department's Erosion and Sediment Pollution Control Program Manual, January 1996, p. 1, identifies sediment as the "greatest source of pollution to Commonwealth waters," leading to "tremendous" ecological and physical damage to streams, rivers, and other water bodies.

der the NPDES permit, and thus assumed joint and several liability for all duties and obligations under the permit. Leeward also certified on the co-permittee application:

I certify, under the penalty of law that this transfer agreement was prepared by me or under my direction and supervision. I also acknowledge and agree that the Best Management Practices (BMPs), including the Erosion and Sedimentation (E & S) Control Plan, the Preparedness, Prevention and Contingency (PPC) Plan, and other storm water pollution prevention and minimization strategies already installed for or on behalf of the current permittee will continue to be implemented and maintained. I further acknowledge, under penalty of law, that I have read, understand, and agree to abide by the terms and conditions of the Individual or General NPDES Permit requirements, as applicable, to ensure that water quality standards and effluent limits are attained. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for known violations.

The Department inspected the sites a number of times after work commenced, from September 1997 until January 1998, and found numerous violations regarding Leeward's failure to install or maintain erosion and sediment control facilities. Nearly half of the project was found to be unprotected by such facilities, and sediment-laden water was being discharged from the sites into the protected waters of the Commonwealth. Accordingly, the Department, on January 16, 1998, issued two compliance orders upon Leeward ordering immediate compliance and revisions to the E & S plans. Leeward did not appeal these orders. The Department later determined that Leeward continued to fail to implement the E & S plans and issued two "stop work orders" upon Leeward on February 20, 1998. These orders required the cessation of all construction activity except for those actions necessary to implement and maintain erosion and sediment control facilities. The orders also required additional revisions to the E & S plans. On April 15, 1998, the Department issued another "stop work order" upon Leeward with regard to the Borrow site. The Department determined that Leeward ignored that order.

Leeward appealed the stop work orders to the Board. Following a hearing, the Board dismissed Leeward's appeal on June 13, 2000, finding that the project was causing polluted discharges and that Leeward failed to comply with the unappealed compliance orders. Thereafter, the Department filed a complaint against Leeward requesting the Board assess civil penalties as authorized by The Clean Streams Law. Following a hearing, the Board found significant noncompliance with erosion and sediment control by Leeward and the Board issued an adjudication assessing a total of $258,500 of civil fines. The fines were delineated as follows: $109,000 for Leeward's chronic failure to install and maintain effective erosion and sediment control facilities and for operating without an approved E & S plan; $49,000 for Leeward's discharge of sediment pollution into the waters of the Commonwealth; and $100,000 for Leeward's deliberate violations of the Department's stop work orders. This petition for review followed.

■■■ This Court's scope of review is limited to whether the Board's findings of fact are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Martin v. Department of Environmental Resources,* 120 Pa.Cmwlth. 269, 548 A.2d 675 (1988).[3]

---

3. Also, the "capricious disregard" of evidence standard of review is now a component of

In reviewing the Board's penalty assessments, this Court may not substitute its judgment for that of the Board, and so long as the penalties reasonably fit the violations, the Board must be upheld. *Id.* Further, credibility determinations are made by the Board as fact finder. *Id.*

Leeward raises the following issues: (1) whether the penalty is reasonable in relation to Leeward's conduct; (2) whether the Board erred by allegedly refusing to allow Leeward to introduce evidence of its costs and expenses incurred in attempting to comply with the Department's orders and maintaining erosion and sedimentation controls; (3) whether Leeward's conduct was negligent as opposed to reckless or intentional, as found by the Board; (4) whether the Board erred by finding that E & S plans were "professional guesswork" with uncertain results; and (5) whether the Board erred by not considering the "fact" that the Department approved a defective E & S plan prior to Leeward's involvement. Leeward argues these issues in somewhat reverse order as they are stated, however, and we shall address them in the order raised in the Argument section of Leeward's brief.

At the outset, it must be observed that the Board's decision is detailed, thorough, and exhaustive. It runs for 46 pages and encompasses 54 findings of fact. The numerous violations found at the sites, most of which Leeward does not contest, are set forth in the opinion. These include failure to implement E & S plans, failure to construct and/or maintain adequate E & S controls, and violation of stop work orders. For example, the Board's Finding of Fact

No. 42 sets forth sixteen violations occurring at the Wal–Mart site from September 18, 1997 until September 16, 1998; Finding of Fact No. 43 found that earth moving had occurred at the Waste site for several months virtually without any E & S controls; Finding of Fact No. 44 sets forth thirteen additional violations at the Waste site from January 29 until September 16, 1998; and Finding of Fact No. 46 sets forth ten violations at the Borrow site from April 14 until September 16, 1998. The Board also documents at least six instances of severe and excess sedimentation discharge into Holbert Creek, surrounding wetlands, the unnamed tributary, and/or the Lackawaxen River, during a six-month period in 1998. The Board also painstakingly details how it arrived at its assessment of penalties, taking numerous matters into account, including the mitigating efforts Leeward made to control erosion and sediment and the difficulties that the sites exhibited. *See* Board's Decision, pp. 16–44. Moreover, the Board's findings of fact and points made in its discussion all are backed by references to evidence in the record.

■ Leeward's arguments largely ignore the Board's factual findings and the evidence supporting them. Instead, Leeward discusses *other* evidence of record, including the testimony of its expert witness, Gary Brown, whom the Board specifically found not to be credible. Board's Decision, p. 20. To this extent, Leeward is impermissibly asking this Court to reweigh the evidence and make different credibility determinations, a process we

appellate consideration in every administrative agency adjudication where the question is properly brought before the Court. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe),* 571 Pa. 189, 812 A.2d 478 (2002). Leeward has not formally raised a capricious disregard of evidence issue in

this case. *Wintermyer* reaffirms the longstanding principle, however, that the agency's decision must be upheld when the agency has considered all of the evidence, and where substantial evidence supports the agency's critical findings of fact and its legal conclusions.

may not engage in. *Szarko v. Department of Environmental Resources,* 668 A.2d 1232 (Pa.Cmwlth.1995), *petition for allowance of appeal denied,* 546 Pa. 647, 683 A.2d 885 (1996). If substantial evidence supports the Board's findings, as it does here, we may not disturb them. *Id.* Moreover, we note that Leeward does not argue that the Board's findings of fact are unsupported by substantial evidence. Rather, it argues that other evidence purportedly demonstrates that its actions are at worst negligent as opposed to reckless and deliberate, as the Board concluded.

■ Leeward's first argument is that it should not be held accountable for the "fact" that the E & S plans approved by the Department, and under which Leeward was to implement erosion and sedimentation controls, were "fatally flawed." Leeward points out that it did not develop these plans, but was simply a co-permittee under them. Leeward argues that it presented "substantial, unrebutted evidence" that the E & S plans were not adequate to address the conditions at the sites, and, if implemented fully, could not keep excessive amounts of sediment from entering nearby waterways. This evidence was in the form of the testimony of Leeward's expert witness, Gary Brown, who testified that the E & S plans guaranteed accelerated sedimentation, that the plans were incurable, and that they failed to take into account the combination of the site's highly erosive soils with the "extreme" degrees of slope involved in the project. Leeward points to testimony from the Department witnesses who apparently stated that no engineering review of the plans was made before approval and that the soils at the sites had not been tested. Leeward therefore concludes that no matter who implemented the plan, pollution would have resulted, that the defects in the plans should

have been a factor in the Board's determination of Leeward's state of mind, and that the Department bears a share in the responsibility for approving defective plans. Moreover, Leeward argues that the Department should have been estopped from penalizing a contractor for failing to comply with a plan that was flawed to begin with.

There was no finding by the Board, of course, that the E & S Plans were flawed, fatally or otherwise.[4] In fact, the Board extensively considered Leeward's arguments regarding any alleged deficiencies with the plans. The Board noted several factors in dismissing them. First, the Board noted that the plans Leeward attacks were Leeward's own plans. Leeward actually commissioned the plan for the Borrow site, and it signed onto and adopted the plans for the Wal–Mart and Waste sites. Leeward then commissioned revisions for these plans. Still, Leeward argues that although it agreed to bear responsibility for the plans, it should not be required to shoulder this responsibility because the Department had approved the plans.

We agree with the Board's assessment of this argument:

To state the argument is to reveal its absurdity. When a permittee submits or adopts a plan, it is representing to the [Department's] District, and fundamentally to the citizens of the Commonwealth, that the plans will work. The District is entitled to rely upon the truth of that representation and the accuracy of the data and the competency of the professional conclusions that are submitted in support of the representation. The District reviews the information using limited resources on behalf of the public, not the permittee. The District

---

4. Thus, there is no "fact" that the plans were    flawed.

is not the permittee's consultant. The District does not vouch for the plans. The District does not represent, let alone guarantee that plans will work. Leeward cannot possibly rely on the District's reliance upon Leeward's designs. Although this concept is so basic that it would seem to go without saying, lest there be any doubt, it was also spelled out in the permit: 'Feasibility of the E & S Plan, structural design and proper construction methods are the responsibility of the permittee....'

Board's Decision, pp. 23–24 (citation omitted).

Second, the Board notes that Leeward's attack on the plans' alleged failure to address the erosive nature of the soil and the "extreme" degrees of slope at the sites is especially an attack on its own plans, particularly where Leeward revised the plans and adopted the soils and other information of the original plans. Further, in contradiction to Leeward's arguments, the Board observed that the plans do address the nature of the soils. Moreover, we note that to a large degree Leeward builds its argument on selected evidence from the record, and particularly on the testimony of Mr. Brown, whom the Board found to be less than credible. Again, to this extent, Leeward is impermissibly requesting this Court to reweigh the evidence and draw new credibility determinations.

With regard to the issue of the "extreme degrees of slope" at the project, the Board correctly notes that Leeward knew the topography of the sites when it agreed to do the work and signed onto the permits and E & S plans. Further, the Department correctly argues that the evidence shows that only a portion of the slopes

below the proposed store and parking area were designed to be at a 1:1 grade, while all remaining slopes were to be built on a 2:1 grade.

Finally, the Board correctly noted that Leeward's arguments, "with minor exceptions," have little or no factual relevance to the vast majority of its violations. This is because Leeward's violations largely concerned its failure to install or maintain *any* erosion and sediment containment controls. Thus, Leeward's violations generally had little or nothing to do with any alleged imperfections of the plans, but involved its failure to implement these plans or install and maintain the necessary controls.[5] For example, Leeward commenced work on the Borrow site without installing any controls, and for at least three to four weeks worked on a critical portion of the Wal–Mart site without any controls.

The Board's findings emphasize the off-target nature of Leeward's arguments with its illustration of Leeward's lack of attention to maintenance of Sediment Basin No. 1 (SB 1), described as one of the most important sediment controls on the project. We quote the Board:

Leeward has made much of the fact that the soils did not settleout [sic] very well in SB 1. Leeward contends that the plan should have accounted for that fact (although it does not explain exactly how). Leeward has advocated everything from the nature of the soils, to the limitations on the depth of the pond, to the weather, to the District's alleged lack of review, to groundwater infiltration to explain the lack of settling. Yet, even if all of these contributing factors were present, the fact remains that Leeward did not take the elementary step of cleaning out the basin on a regular basis. For the

---

5. Leeward's argument that it would not have mattered that it fully implemented and maintained the plans, because they were allegedly "fatally flawed," is based on two wholly inadequate pillars: an attack on its own plans and its responsibilities thereunder, and an argument on evidence largely rejected by the Board.

life of the project, which lasted approximately one year, Leeward only cleaned out the basin twice. Leeward cites these two cleanouts without any apparent sense of embarrassment or irony as examples of its diligence. . . . We are left to speculate why, with all of the claimed difficulties that arose at the site, and the critical importance of SB 1 in controlling pollution, that personnel and equipment were not assigned to clean out the basin more frequently. Instead several photos showed it to be consistently loaded with silt. . . . The silt remained in place so long that grass started to grow on it. . . . The basin's outlet was also neglected. The basin's faulty design, assuming there was one, did not excuse Leeward's lack of maintenance.

Board's Decision, pp. 27–28 (citations omitted).[6]

■ Leeward's arguments that the Board erred by not considering the alleged defective design of the E & S plans are

thus wholly without merit.[7] Thus, there is absolutely no basis to Leeward's argument that the Department should have been estopped from penalizing it on the basis that the Department approved E & S plans that were "flawed." Leeward's argument is based on the following fallacies: that it was simply something of an innocent bystander with no or little responsibility of its own; that it implemented the plans but pollution resulted anyway, or that its failure to implement the plans was irrelevant since they would not have worked; and that the Department misled it into believing that it could let sediment-laden runoff engorge the Commonwealth's waterways because it approved "flawed" plans. Leeward's astonishing argument at best is built upon a total disregard of the Board's unchallenged findings of fact regarding its behavior, not to mention its agreed-upon responsibilities under the permits.

■ Leeward next argues that the civil fine was excessive because the evidence

6. Leeward argues in its brief that it "never had the opportunity" to clean out SB 1 because the basin was never "dewatered," that it was "preferable" to clean out a basin when it is dry, and therefore Leeward could not remove the sediment "in an efficient and effective fashion." Leeward's Brief, p. 26. Leeward never explains why it could not dewater the basin itself or even proceed to remove the sediment in a less than efficient fashion. Certainly there was no duty on the Department to dewater the basin.

7. In its reply brief, Leeward raises a new argument, that the Department had the burden to prove that the plans complied with its regulations set forth at Chapter 102 of Title 25 of the Pennsylvania Code. Aside from the fact that new arguments, or the rehashing of arguments in the brief, are not to be raised in the reply brief (*see Filoon v. Pennsylvania Public Utility Commission*, 167 Pa.Cmwlth. 693, 648 A.2d 1339 (1994), the argument is unsupported by any authority. Further, it is wholly groundless in face of the fact that Leeward is once again attempting to shed any of its agreed-upon responsibility under the plans and the fact that Leeward's simple fail-

ure to install and maintain controls at the sites, and not the plans themselves, pursuant to the Board's findings of fact, were the sources of the pollution. We would simply note that Chapter 102 clearly places the burden upon the contractor or other person involved with earth disturbance, not the Department, to develop, implement, and maintain controls to minimize the potential for accelerated erosion and sedimentation. *See* 25 Pa. Code § 102.2.

Further, Leeward challenges the Board's comment that the plans were "simply a best professional guess of what will work." Board's Decision, p. 26. The Board explained that only field conditions will ultimately show what will or will not work and that modifications may well be necessary to any plan. In fact, the E & S plans specifically stated that "[a]dditional erosion and sedimentation controls may be necessary depending upon actual construction methods employed." *Id.* Leeward has advanced no legal or logical argument that shows that the Board erred in making this assessment of the plans.

does not support the Board's findings that it acted recklessly or intentionally. Leeward points to the evidence of its "good faith efforts" throughout the project to "cooperate with the Department" in implementing the E & S plans and controlling erosion and sedimentation.[8] Leeward also compares the present case with another Board decision, *Department of Environmental Protection v. Silberstein*, 1996 EHB 619, wherein the Board allegedly found negligent, as opposed to reckless, a contractor who failed to implement an approved E & S plan. Leeward contends that its failings were no worse than Silberstein's. Leeward also argues that it did not intentionally violate the Department's stop work orders. These orders required the cessation of earthmoving except for certain activity related to site stabilization. Leeward argues that the language of the orders was broad enough to be interpreted as allowing for "permanent" stabilization, including paving and curbing. Leeward contends that because of the alleged ambiguity, it could not be found to have intentionally violated the orders.

We cannot agree that the evidence does not support the Board's determination that Leeward acted recklessly. The Board found that during the life of the project, Leeward received forty-three inspection reports, five notices of violation, and five compliance orders, all documenting numerous violations. Leeward never received "a clean bill of health," never attained site-wide compliance, and committed violations that "pervaded the entire project." Board's Decision, p. 18. Leeward commenced major earthmoving activities at the Borrow site, for example, without installing any erosion and sedimentation controls and continued to do so even after receiving inspection reports and compli-

ance orders regarding violations at the site. An inspection made on January 7 and 8, 1998 showed that Leeward failed to install erosion control facilities, as required by the plans, for more than 45% of the 50-acre project, even after receiving five inspection reports and one notice of violation.[9] Leeward failed to adequately clean out SB 1, described as of critical importance to sedimentation control. Thus, the factual record fully supports the Board's conclusion that Leeward acted with "conscious disregard" of its obligations to control accelerated erosion and excess sedimentation.

We also note that Leeward quite incorrectly states that the Board ignored its "good faith" efforts to control erosion and sedimentation. Even a cursory reading of the Board's decision demonstrates the incorrectness of Leeward's position. Simply because the Board levied a heavy fine upon Leeward does not mean that it did not consider its positive efforts.

Leeward's argument that *Silberstein* requires that its actions be characterized as "negligent" is severely undercut by the fact that Silberstein's violations were documented over four days of inspections, not forty-three, and the area affected was described as small. *Silberstein*, 1996 EHB at 639. There was no finding in *Silberstein* that the contractor violated compliance orders issued by the Department. The Board found that Leeward violated five of them, a rather major indication of reckless if not willful behavior. More importantly, however, we may not substitute our judgment for that of the Board when assessing penalties. *Martin*. The conclusion that Leeward acted recklessly is wholly supported by the record.

---

8. Leeward outlines these efforts in pp. 25–32 of its brief.

9. Leeward began to receive warnings in September 1997.

Leeward's next argument, that it should not have been found in violation, or at least willful violation, of the stop work orders, is based on several matters. First, it argues that the orders were "vague" in that, although they ordered the cessation of earthmoving activities, they exempted activities related to interim stabilization and E & S controls. Leeward emphasizes that the orders' language states that these exempted activities "includ[ed] but [were] not limited to" seeding, mulching, design repairs to failed slopes, drainage matters, and stabilization. Also, Leeward contends that "earthmoving" is not defined in the orders.[10] Leeward thus takes the position that it was justified to continue *all* work at the project with the argument, as we read it, that stabilization is achieved by actually completing the project.

Leeward also, in a somewhat contradictory manner, *admits*, or appears to admit, that it violated the stop work orders. It argues, however, that it did not do so willingly because of the "vagueness" of the orders. It also identifies selected evidence from the record suggesting that it did not intentionally violate the orders. This evidence was that the Department, following the issuance of the orders, directed that Leeward stabilize certain areas; that Department inspectors issued "earth disturbance reports" that did not state that Leeward was violating stop work orders; and that Department personnel on the site did not accuse it of violating the orders.

First, Leeward's argument concerning its interpretation of the stop work orders is quite unpersuasive. In essence, Leeward is arguing that the orders have no meaning. That is, according to Leeward, a contractor can complete a project, de-spite an order to stop, on the theory that its completion, or near completion, even without necessary E & S controls, will ultimately stabilize the site. To state Leeward's argument is to demonstrate its absurdity.[11]

Second, the Board found that even if Leeward might justifiably conclude that it could complete at least some projects in an effort to achieve stabilization, the record shows that Leeward went well beyond stabilization activity after the orders were issued. In fact, the record shows that Leeward hardly broke stride and simply went ahead with the project. *See* Footnote 4 of the Board's Decision showing Leeward's activities, as documented by its daily logs, following the issuance of the stop work orders.

Third, Leeward's argument that the Department should have also told it that it was violating the orders is groundless for several reasons, not the least of which is that it is not the Department's duty to daily monitor Leeward and advise it. The record shows, in fact, that the Department issued several warnings and that Leeward repeatedly asked that the orders be lifted and, in fact, appealed the orders. Leeward's argument that certain evidence "suggests" that it was not in willful non-compliance is yet another, impermissible effort by Leeward to ask this Court to reweigh the evidence. Once again, Leeward fails to fully address the Board's findings and conclusions in making its assignment of error; instead it ignores these and highlights other evidence in the hope of generating a different result. Again, we are not the fact finder, and the record supports the Board's findings that Lee-

10. Leeward further contends that the orders did not actually include the words "stop work."

11. The Board noted that if Leeward was confused about the meaning of the order, it simply could have called the District office for clarification.

ward willfully violated the stop work orders and should be fined accordingly.

■ Leeward next argues that the Board failed to accept into evidence Leeward's costs in implementing the E & S plans and those following the Department's directives. Leeward contends that this evidence relates to the Board's decision to assess a penalty that would ensure that the offending company not profit from violating the law. Leeward thus contends that evidence of its losses was relevant. Leeward also argues in a footnote that the Board erred by assessing a penalty designed in part to deter other contractors from acting in like fashion. This argument is fleshed out to a greater degree in an *amicus curiae* brief of the Pennsylvania Utilities Contractors Association, who argues that deterrence is an appropriate factor to be considered in assessing criminal fines but not civil fines under Pennsylvania law. The Association argues that deterrence is impermissible in arriving at a "reasonable fit" between the civil penalty and the offending action.

The evidence that was excluded is identified by Leeward as that offered during the direct examination of Eric Linde at Notes of Testimony (N.T.), p. 1501. Leeward describes the evidence in its brief as "financial records showing the purchase and installation of silt fence, excelsior matting, geotextiles and hay." Leeward's Brief, p. 44. The document offered at page 1501, however, was Leeward's Exhibit 94, a type-written "Summary Sheet" setting forth dollar amounts for the items mentioned in Leeward's brief, totaling $219,787.22. There is no information on the sheet as to who prepared it, when it was prepared, or how the figures were calculated. There is no indication that these costs were connected solely to E & S controls, or were also part of Leeward's basic expenses concerning the excavation

and construction of the project. Mr. Linde identified Exhibit 94 only as a summary, and an incomplete one at that, of "what we found on Monday in our files...." N.T., p. 1501. The Department's objection to the document as one offered without proper foundation was sustained.

■ The liberal rules of evidence relating to administrative agencies give our agencies broad discretion in admitting *or excluding* evidence, so that exclusion alone may not constitute procedural defect. *News–Chronicle Co. v. Pennsylvania Human Relations Commission*, 672 A.2d 400 (Pa.Cmwlth.1996). There was no abuse of discretion in rejecting Leeward's Exhibit 94. Leeward's attempt to argue that the rejection of this document from evidence alone prohibited it from introducing *any* evidence about its costs is wholly unfounded. Indeed, Mr. Linde, following the rejection of Exhibit 94, proceeded to testify regarding Leeward's use of a subcontractor to seed, mulch, and fertilize fill slopes. *See* N.T., p. 1509. Moreover, we held that remediation costs that a violator expended cannot be used to offset penalties properly assessed. *Westinghouse Electric Corp. v. Pennsylvania Department of Environmental Protection*, 745 A.2d 1277 (Pa. Cmwlth.2000).

■ Finally, because Leeward did not formally raise the issue of whether the Board erred by considering the deterrent effect to other contractors in arriving at its fine, we need not address this issue. We see no basis, however, to conclude that deterrence may never be a factor in assessing a penalty that is otherwise based on a proper factual foundation. *See id.*

For the above reasons, the Board's decision is affirmed.

## ORDER

AND NOW, this 9th day of January, 2003, the order of the Environmental Hearing Board in the above-captioned matter is hereby affirmed.