[No. B153817. Second Dist., Div. Four. Dec. 17, 2002.]

CONSUMER ADVOCACY GROUP, INC., Plaintiff and Appellant, v. EXXON MOBIL CORPORATION, Defendant and Respondent.

**COUNSEL**

Environmental Law Foundation, James R. Wheaton, Iryna Kwasny and Megan Evart; Yeroushalmi & Associates and Reuben Yeroushalmi for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Craig C. Thompson, Edward G. Weil, Dennis A. Ragen and Susan S. Fiering, Deputy Attorneys General for People of the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Richard Toshiyuki Drury and William B. Rostov for Communities for a Better Environment as Amicus Curiae on behalf of Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Jeffrey J. Parker and Lori A. Osmundsen for Defendant and Respondent.

McKenna Long & Aldridge, Stanley W. Landfair, Michael J. Stiles; Steinhart & Falconer, Jeffrey M. Hamerling and Matthew S. Covington for Atlantic Richfield Company, Mobil Corporation, Unocal Corporation and Chevron U.S.A., Inc., as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**VOGEL (C. S.) P. J.—**

## INTRODUCTION

In 1986, the electorate passed Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986. It is now codified in Health and Safety Code sections 25249.5-25249.13.[1] Section 25249.5 provides, in pertinent part: "No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water . . . ." The initiative provides both for fines and injunctive relief. Subdivision (b) of section 25249.7 provides that anyone who has violated section 25249.5 "shall be

---

[1]All subsequent statutory references are to the Health and Safety Code unless stated otherwise.

liable for a civil penalty not to exceed $2,500 per day for each such violation in addition to any other penalty established by law." Subdivision (a) of section 25249.7 provides that "[a]ny person that violates or threatens to violate Section 25249.5 . . . may be enjoined in any court of competent jurisdiction."

This appeal comes to us in the form of a stipulated judgment in which the parties agreed to the pertinent facts in order to expedite appellate review of an important question of law. (See, e.g., *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 399-402 [87 Cal.Rptr.2d 453, 981 P.2d 79].) The appeal raises only one question of law, an issue of statutory interpretation. Does the "passive migration" or "continued presence" of a prohibited chemical in the soil constitute a "discharge or release" within the meaning of section 25249.5? We conclude the answer is "no."

### FACTUAL AND PROCEDURAL BACKGROUND

Insofar as is pertinent to this appeal, respondent Exxon Mobil Corporation (Exxon), sued as Exxon Corporation, owned 17 gas stations. The most recent date Exxon operated any of those gas stations was July 18, 1995.

In August 1999, Consumer Advocacy Group, Inc. (plaintiff) filed an action against Exxon and the corporate operators of four other gas stations.[2] Plaintiff's action is authorized by subdivision (d) of section 25249.7 which permits "any person in the public interest" to file an action if the prosecuting authorities, after having been given notice, decline to act.

The complaint alleged two causes of action based upon the same set of operative facts: chemical constituents from gasoline (benzene, lead, and toluene) were present in the soil and ground beneath the former gas stations. The State of California has designated benzene and lead as chemicals that cause cancer and reproductive toxicity and toluene as a chemical that causes reproductive toxicity.

The first cause of action alleged the presence of the three chemicals constituted a discharge or release of prohibited chemicals into sources of drinking water in violation of section 25249.5. According to the complaint, "[t]he sources of drinking water into which the discharges and releases have occurred, continue to occur, and are likely to occur are the groundwaters located beneath and immediately surrounding the [gas stations]. . . . [¶]

---

[2]The four are Atlantic Richfield Company, Mobil Corporation, Unocal Corporation, and Chevron U.S.A., Inc. They have filed a joint amici curiae brief in support of Exxon.

The contaminated soil and earth beneath each of the [gas stations] continue to hold and retain [the three chemicals], and release the same into the groundwaters coming into contact therewith." Pursuant to subdivision (b) of section 25249.7, plaintiff sought "a civil penalty [of] $2500 per day for each such violation" as well as injunctive relief authorized by subdivision (a) of section 25249.7.[3]

The second cause of action, brought pursuant to the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), alleged the violation of section 25249.5 constituted an unfair business practice. Plaintiff sought injunctive relief as well as restitution to disgorge "ill-gotten gains, including, but not limited to, money and falsely-obtained . . . goodwill of unknowing and misled consumers."

The complaint also sought recovery of reasonable attorney fees and costs.

In order to conserve judicial resources and to expedite appellate review, plaintiff and Exxon entered into a stipulated judgment based upon the following facts.

At some point in time, constituents of gasoline have been found in the soil or groundwater at the sites in question. Although the parties disagreed about "which statute of limitation applies to claims under Proposition 65[,] there is no dispute that the maximum possible statute of limitation applicable to any claim asserted by Plaintiff is four years, as prescribed by Bus. & Prof. Code § 17208." Because Exxon had not actively operated any of the gas stations for more than four years prior to the filing of the complaint, Exxon "could not have 'discharged' or 'released' a Proposition 65-listed chemical as alleged in the Complaint during a period within the statutes of limitation."[4] Accordingly, the only theory of liability potentially applicable to

---

[3]The stipulated judgment recites plaintiff sought "an injunction that would require Defendants to remediate alleged contamination at the facilities in a manner Plaintiff contends that Proposition 65 requires." The question of whether or not section 25249.7, subdivision (a) authorizes injunctive relief to remediate a violation is not an issue raised by this appeal. This appeal involves only one question: whether plaintiff, by claiming a "passive migration" or "continued presence" of toxic chemicals constitutes a "release" or "discharge" within the meaning of section 25249.5, has properly alleged the predicate facts to seek *any* relief for a violation of section 25249.5. The parties' stipulation expressly recites they reserve their rights to, inter alia, contest the availability or applicability of injunctive relief under Proposition 65. We therefore express no opinion as to the scope of relief afforded by section 25249.7, subdivision (a).

[4]The statute of limitations for a violation of the unfair competition law is four years. (Bus. & Prof. Code, § 17208.) The statute of limitations applicable to claims for statutory penalties and injunctive relief are, respectively, one and three years. (Code Civ. Proc., §§ 340, subd. (*l*) and 338, subd. (a).)

Exxon was that the "continued presence" or "passive migration" of designated chemicals in the soil or groundwater constituted a "discharge" or "release" within the meaning of section 25249.5.[5]

That straightforward legal issue had already been addressed and decided in two separate lawsuits, one in Los Angeles and one in San Francisco. In each case, the trial court, in the context of a motion for summary adjudication, had ruled section 25249.5 neither imposed liability nor provided for injunctive relief based upon the "continued presence" or "passive migration" of prohibited chemicals in the soil. Plaintiff and Exxon agreed those two rulings controlled disposition of the present case.[6]

Plaintiff and Exxon therefore stipulated to the trial court entering judgment in favor of Exxon on all of plaintiff's claims. In addition, the trial court stayed the litigation of the claims against the four other defendants pending resolution of an appeal by plaintiff.

This appeal by plaintiff follows. Communities for a Better Environment and the Attorney General of the State of California have each filed an amicus curiae brief supporting plaintiff.[7] The four other defendants in this lawsuit, Atlantic Richfield Company, Mobil Corporation, Unocal Corporation, and Chevron U.S.A., Inc., have filed a joint amici curiae brief in support of Exxon. (See fn. 2, *ante.*)

## DISCUSSION

In interpreting the language of Proposition 65, we are guided by well-settled rules of construction. ▮ In a case analyzing another phrase in the initiative, *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294 [58 Cal.Rptr.2d 855, 926 P.2d 1042], our Supreme Court summarized those principles as follows. " 'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the

[5]The stipulated judgment recites that the gist of plaintiff's case is the theory that "the 'continued presence' of [benzene, toluene, and lead] in soil and/or groundwater at the stations and the 'passive migration' of the chemicals after their initial discharge or release into soil and/or groundwater constitutes a new and continuous 'discharge' or 'release' of the chemicals for purposes of Proposition 65, each day until no amount of the chemicals remains in soil and/or groundwater at the site."

[6]Because those rulings were interlocutory in nature, appeals have not been prosecuted in either of those two cases.

[7]Before arguing the merits in favor of plaintiff, amicus curiae Communities for a Better Environment requests that we dismiss the appeal as being collusive and an improper attempt to obtain an advisory opinion about a controversy not yet ripe for adjudication. The request is denied.

court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citation.] Of course, in construing the statute, '[t]he words . . . must be read in context, considering the nature and purpose of the statutory enactment.' [Citation.]" (*Id.* at p. 301.) ▇▇ When, as here, the phrase ("discharge or release") is not defined within the initiative,[8] "it can be assumed to refer not to any special term of art, but rather to a meaning that would be commonly understood by the electorate." (14 Cal.4th at p. 302.) To determine the common meaning, a court typically looks to dictionaries. (*Ibid.*)

Dictionaries consistently define "discharge" or "release" as movement from a place of confinement to another place where there is no confinement. For instance, both Merriam-Webster's Collegiate Dictionary (10th ed. 2000) at page 329 and Webster's Ninth New Collegiate Dictionary (1988) at page 360 define "discharge" as "to release from confinement, custody, or care" or "to pour forth fluid or other contents," and define "release" at pages 984 and 994, respectively, as "to set free from restraint [or] confinement," and "to relieve from something that confines." Webster's II New Riverside University Dictionary (1984) at page 383 defines "discharge" as "[t]o relieve of . . . contents," "[t]o unload or empty (contents)," and "[t]o pour forth contents," and defines "release" at page 992 as "[t]o set free from confinement [or] restraint," "[a]n unfastening or letting go of something caught or held fast," and "[a] freeing of something for general . . . circulation." The Oxford American Dictionary of Current English (1999) at page 220 defines "discharge" as "let go, or release, esp[ecially] from a . . . period of confinement," "pour out or cause to pour out (pus, liquid, etc.)," and defines "release" at page 675 as to "set free; liberate; unfasten." And Webster's College Dictionary (1991) at page 383 defines "discharge" as "to pour forth" and defines "release" at page 1137 as "to free from confinement," "to free from anything that restrains or fastens." In sum, these dictionary definitions of both "discharge" and "release"—the definitions the electorate is assumed to have used in voting for Proposition 65—all convey an active concept: that the actor releases something that was previously confined. The word "contents" indicates the "release" or "discharge" of a chemical maintained in a structure or fixture that had contained or restricted such chemical. These definitions therefore all convey movement out of a confined space such as a container, not, as plaintiff suggests, simply movement from one point to another—the concept implicit in its claim that "passive migration" or "continued presence" are embraced within the meanings of "discharge" and "release" as used in section 25249.5.

▇▇ Another important factor in interpreting words used in a ballot initiative is the explanatory material in the ballot pamphlet. (*People ex rel.*

[8]Section 25249.11 defines other terms in the initiative but not "discharge" or "release."

*Lungren v. Superior Court, supra,* 14 Cal.4th 294, 306; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 541-543 [277 Cal.Rptr. 1, 802 P.2d 317].) "[W]hen . . . the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) ■■■ In this case, the arguments advanced by the proponents of the initiative support the conclusion that "discharge" and "release" refer to an act of releasing chemicals previously confined.

For instance, the argument in favor of the initiative read, in part: "Proposition 65 singles out chemicals that are scientifically known to cause cancer or reproductive disorders (such as birth defects). Effectively, it tells businesses: *Don't put these chemicals into our drinking water supplies.*" (Ballot Pamp., Gen. Elec. (Nov. 4, 1986) argument in favor of Prop. 65, p. 54, italics added.) It explained: "These new laws will not take anyone by surprise. They apply only to businesses that *know* they *are putting* one of the chemicals out into the environment . . . ." (*Ibid.,* second italics added.) "Fines and jail terms are doubled for toxic crimes like midnight *dumping.*" (*Ibid.,* italics added.)

Similarly, the rebuttal to the ballot argument against the initiative read: "The big oil and chemical companies are leading the opposition [to the initiative]—because they know they would be forced *to stop dumping extremely dangerous chemicals into your drinking water if Proposition 65 passes.* . . . [¶] . . . [¶] Proposition 65 simply says that *businesses shouldn't put chemicals* that are scientifically known to cause cancer, or birth defects, *into your drinking water.*" (Ballot Pamp., Gen. Elec., *supra,* rebuttal to argument against Prop. 65, p. 55, italics added.)

"Put" is defined as "[t]o place in a specified location." (The American Heritage Dict. (2d college ed. 1976) p. 1007.) And "dump" is defined as "[t]o release or throw down in a large mass" or "[t]o empty (material) out of a container or vehicle" or "[t]o get rid of." (*Id.* at p. 429.) The use of these words indicates the electorate intended to subject to a penalty the action of actively placing toxic chemicals into the drinking water. That was the conduct the electorate intended to render culpable.[9] Nothing in the ballot materials even suggests this portion of the initiative was intended to include

---

[9]This is the same conclusion the Attorney General reached in a 1987 opinion construing another portion of Proposition 65, section 25180.7. That section involved the duty of a

migration of chemicals that had already been discharged or released. In sum, the electorate did not intend section 25249.5 to create liability for each day the chemicals *which had already been released or discharged into the ground* thereafter remained in or passively migrated through the ground. (See *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 43-44 [127 Cal.Rptr. 122, 544 P.2d 1322] [Wat. Code, § 13350, subd. (a)(3), which imposed civil penalties for depositing oil in water created liability for each day oil was deposited, not each day oil remained in the water].)

The contrary arguments of plaintiff and amici curiae are not persuasive.[10]

They rely upon some dictionary definitions of "discharge" or "release" which arguably include the passive spread of a chemical constituent such as benzene, lead, or toluene. This approach misses the mark. We must construe the words in context, considering the nature and purpose of the statutory enactment, and taking into account the meaning commonly understood by the electorate. (*People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th 294, 301-302.) Taken as a whole, the dictionary definitions have a common *active* concept: the movement from a place of confinement to a place without confinement. The ballot arguments about dumping and putting toxic chemicals into the drinking water clearly refer to active conduct or nonfeasance as opposed to the notion that "discharge" and "release" include any passive abstraction not involving specific conduct or an act of omission. And the purpose of section 25249.5—imposition of civil fines and permitting injunctive relief to stop a violation or threatened violation—is furthered by defining the words in an active manner because that definition makes the culpable conduct discrete.[11]

government employee to disclose information about "the illegal discharge or threatened illegal discharge of a hazardous waste." (§ 25180.7, subd. (b).) The Attorney General wrote, in part: "Section 25180.7 requires that there be a 'discharge,' actual or threatened, of a hazardous waste. Discharge is not defined by the statute. Webster defines discharge as a 'release from confinement.' In the context of section 25180.7 we think *discharge refers to a release of the hazardous waste from a place of safe confinement into an environment* where it may cause harm to humans." (70 Ops.Cal.Atty.Gen. 130, 135 (1987), italics added.)

[10]Amicus curiae Communities for a Better Environment also raises the argument that the passive migration of groundwater contaminants is a continuing nuisance and Proposition 65 is simply an extension of nuisance law. In addition, the Attorney General briefly touches on this argument. We do not reach the merits of this contention because it was not advanced by plaintiff either in the trial court or on his appeal. We adhere to the general rule that issues not raised by the appealing parties but advanced for the first time by amici curiae are not considered. (*Mercury Casualty Co. v. Hertz Corp.* (1997) 59 Cal.App.4th 414, 425 [69 Cal.Rptr.2d 9].)

[11]In one of the two earlier cases rejecting plaintiff's interpretation of the words, the superior court wrote: "[I]f Proposition 65 were interpreted to penalize a person for every day that he or she leaves toxics in the ground or fails to clean up a prior spill, there would be

Equally unavailing is the reliance by plaintiff and amici curiae upon how other statutory schemes define "discharge" and "release." In that regard, they primarily point to federal decisional law defining "release" as used in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) and state law regulating the underground storage of hazardous substances (Health & Saf. Code, §§ 25281, subd. (o), 25501, subd. (s)). This reliance is completely misplaced. There is absolutely no reference to these statutory schemes in either the text of Proposition 65 or the supporting ballot arguments. Consequently, there is nothing to suggest that by voting for Proposition 65, a voter intended to adopt or incorporate either judicial decisions that defined "release" in a federal environmental law or state statutory definitions related to the underground storage of hazardous substances. For the same reasons, plaintiff and amici curiae's citation to decisions of the State Water Resources Control Board interpreting "discharge" for purposes of the Water Code is unavailing.

The further suggestion of plaintiff and amici curiae that our Supreme Court's decision in *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th 294, defined "release" as passive migration for purposes of interpreting section 25249.5 is incorrect. That case involved defining the phrase "source of drinking water" found in section 25249.5 and, in particular, deciding whether it included household faucets and faucet water. The Attorney General had brought an action against manufacturers and distributors of drinking water faucets based on the theory the faucets leached a toxic chemical (lead). Beginning with the definition of "source of drinking water" found in section 25249.11 (see fn. 8, *ante*), the court concluded Proposition 65 prohibited the discharge of toxic chemicals into faucet water so that the "lead pipe contamination of faucet water is also a prohibited release of a toxic chemical directly into a 'source of drinking water.'" (14 Cal.4th at p. 304, see also pp. 299 & 305-307.) In discussing the defense contention "that clues as to the meaning of 'source of drinking water' can be derived from use of the term 'release' in section 25249.5" (*id.* at p. 303), the court commented that section 25249.5 "pertains to the 'release,' including *presumably 'leaching,' of toxic chemicals into water* or into or onto land when such

hopeless uncertainty as to the circumstances under which a penalty might be imposed. How quickly, and to what extent, would remediation be required to avoid the penalty? Would a party conducting remediation in compliance with the directives of the appropriate regulatory agency nonetheless be subject to the imposition of a daily penalty while the cleanup efforts continue? Which former owners or possessors of the property would be sub[j]ect to a penalty? Neither the language of section 29249.5—'discharge or release'—nor the accompanying regulations provide the specificity necessary to impose a penalty on this basis. If interpreted as plaintiffs urge, the statute likely would be unconstitutionally infirm because of vagueness." There is much force to this analysis.

chemical passes or probably will pass into a 'source of drinking water.'" (14 Cal.4th at p. 304, italics added.) Contrary to what plaintiff and amici curiae suggest, this conclusion does not conflict with our analysis because in that case the lead was being released from a confined space—the faucet—into the source of drinking water. Any attempt to read a broader meaning into that statement (e.g., to apply it to the passive migration or continued presence of toxic chemicals in the soil) must fail because the predicate facts to such an interpretation were not presented to the court. (See, e.g., *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1230 [254 Cal.Rptr. 410] ["A case is not authority for an issue not raised by its facts."].) In fact, in footnote 9 to its opinion, the Supreme Court acknowledged the limited scope of its analysis when it wrote: "Defendants do not contend that they did not 'knowingly release or discharge' a toxic chemical into water within the meaning of section 25249.5. Thus, . . . we express no opinion regarding construction of this portion of the statute." (*People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at p. 315, fn. 9.)

Lastly, we reject the argument that our interpretation of "discharge" and "release" will undermine the purpose of Proposition 65. Plaintiff and amici curiae first point to language found in the ballot argument supporting the initiative and the preamble to the initiative. The argument stated, in part: "Our present toxic laws aren't tough enough. Despite them, polluters contaminate our drinking water and expose us to extremely toxic chemicals without our knowing it. The health of innocent people is jeopardized. And the public must pay massive costs for cleanup." (Ballot Pamp., Gen. Elec., *supra,* argument in favor of Prop. 65, p. 54.) The preamble provides, in pertinent part:

"Section 1: The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights:

"(a) To protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm. [¶] . . . [¶]

"(c) To secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety.

"(d) To shift the cost of hazardous waste cleanups more onto offenders and less onto law-abiding taxpayers." (Ballot Pamp., Gen. Elec., *supra,* preamble, p. 53, italics omitted.)

They next point to the last paragraph of our Supreme Court's opinion in *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th 294. The paragraph, in which we have italicized the language upon which they rely, reads: "In sum, *we consider Proposition 65 to be a remedial statute* intended to protect the public from, among other things, toxic contamination of its drinking water. *We construe the statute broadly to accomplish that protective purpose.* As discussed above, we conclude that the Attorney General's construction of section 25249.5 to include faucet water as a source of drinking water is not only a reasonable reading of the language of the statute, but is also harmonious *with its basic remedial objectives, i.e., protection of the public.*" (*Id.* at pp. 314-315, fn. omitted, italics added.)[12]

Relying upon the quoted language set forth in the two preceding paragraphs, plaintiff and amici curiae urge that holding "discharge or release" does not include passive migration or continued presence of a prohibited chemical will seriously undermine the intent of the electorate in enacting Proposition 65. We are not persuaded. For one thing, as explained earlier in this opinion, decisional law dictates that our task is, with appropriate reference to the ballot arguments, to interpret the (undefined) language of the initiative based upon the assumption the electorate intended the words to have their commonly understood meaning(s). In that regard, we have concluded "discharge" or "release" as used in section 25249.5 refers to a movement of chemicals from a confined space into the land or water. That conclusion does not undermine the electorate's intent of preventing contamination of drinking water but instead reasonably defines it as applying to a discrete situation. Nor does our decision preclude compelling a polluter to take remedial action. As noted earlier, this appeal does not require us to determine the scope of the injunctive relief afforded by Proposition 65. (See fn. 3, *ante.*) Accordingly, we need not decide the extent to which Proposition 65 can be construed to require remedial action.[13] That issue is simply not before us. Set forth below in footnote 14 are a panoply of federal and state statutory schemes which can afford such relief.[14] If it were to be decided—an issue we do not and cannot address—that neither Proposition 65

---

[12]The Court of Appeal cited this paragraph in *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 461-462 [110 Cal.Rptr.2d 627].) The issue in that case involved the obligation of dental care providers to post a warning about the presence of toxic chemicals.

[13]Exxon argues: "Proposition 65 was drafted as a discharge/release prohibition, not a cleanup statute." We express no opinion on that issue.

[14]The state laws include the Hazardous Waste Control Act (Health & Saf. Code, § 25100 et seq.); the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.), and the Porter Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.). The federal laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), and the Clean Water Act (33 U.S.C. § 1251 et seq.).

nor any of these laws require remediation of either passive migration or continued presence of toxic chemicals, the remedy is to enact, either through another initiative or legislation, laws compelling such a result. We decline the parties' implicit suggestion to construe Proposition 65 as a blank slate upon which any environmental remedy can be written simply because the drafters of the initiative promised it meant "the clearest, most effective toxic control laws in the nation" and "tougher law enforcement."

In sum, to return to the *only* issue posed by this appeal, "discharge or release" as used in section 25249.5 refers to a movement of chemicals from a confined space into the land or the water. The subsequent passive migration of chemicals through the soil or water after having been so discharged or released by a party does not constitute another discharge or release within the meaning of section 25249.5.

## DISPOSITION

The judgment is affirmed.

Hastings, J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 19, 2003. Kennard, J., and Baxter, J., did not participate therein.