George and Shirley STAMBAUGH, Petitioners

v.

### DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2010.
Decided Dec. 10, 2010.

---

Gregory H. Knight, Carlisle, for petitioners.

Susana Cortina de Cárdenas, Assistant Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.

George and Shirley Stambaugh petition for review of an adjudication of the Environmental Hearing Board (Board) directing them to pay civil penalties in the amount of $18,197 for discharging silage leachate into the ground water in violation of the Clean Streams Law[1] and, subsequently, for not responding timely to an order of the Department of Environmental Protection (DEP). The Stambaughs challenge the penalty as excessive, particularly in light of the fact that there was no evidence that their discharge was willful. We vacate and remand.

The Stambaughs own and operate a dairy farm. In September 2005, they constructed an in-ground earthen trench silo

---

1. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–691.1001.

on their farm to hold corn silage. The trench was unlined and covered with plastic tarp secured by tires. The trench was located approximately 90 to 100 feet from two wells located on adjacent land. In October 2005, the neighbors complained about malodorous water coming from their taps. DEP investigated and determined that silage leachate coming from the Stambaughs' trench silo was the source of the problem.

DEP directed the Stambaughs to remove the silage within two weeks, but they did not meet that deadline. Accordingly, DEP issued an order on November 4, 2005, directing the Stambaughs to remove the silage within fifteen days; to provide replacement water supply to the neighbors; to provide treatment to the contaminated water supply; to prepare a temporary and permanent silage storage plan; to prepare a nutrient plan within thirty days; and to prepare a sedimentation and erosion plan within thirty days. The Stambaughs did not appeal the order.

In 2006, DEP issued a notice of violation to the Stambaughs for inadequate compliance with the November 4, 2005, order. The Stambaughs did not respond. DEP then issued a second notice of violation. Again, the Stambaughs did not respond.

DEP then filed a complaint with the Board seeking the imposition of a civil penalty in the amount of $33,772 against the Stambaughs. In their pre-hearing memorandum, the Stambaughs explained that they did not dispute the fact that their trench silo had contaminated their neighbors' wells, but they did not believe their conduct warranted a civil penalty.

At the hearing, Victor H. Landis testified on behalf of DEP. In his work as an environmental compliance specialist for DEP, Landis, *inter alia*, recommends, where appropriate, the imposition of civil penalties. DEP uses a "spill matrix" to calculate penalties for violations of the Clean Streams Law. Reproduced Record at 15a (R.R.—). Landis testified about how the spill matrix applied to the Stambaughs.

With respect to the violation of Section 401 of the Clean Streams Law,[2] which prohibits the discharge of pollution into the waters of the Commonwealth, Landis discussed five factors in the matrix that applied to a Section 401 violation. Damage is the first factor. The Stambaughs' silo rendered the water in two wells unpotable for over six months, for which Landis assessed a $2,000 penalty. The next factor is the degree of culpability, and Landis decided that the Stambaughs had acted with a fairly high degree of culpability by "recklessly" locating their silo close to neighboring drinking wells. For this recklessness he assessed a penalty of $1,000. The third factor requires an examination of the violator's enforcement history, which was non-existent in the case of the Stambaughs and, thus, did not generate a penalty. The fourth factor looks at the amount of discharge, which was estimated between 500 to 1,000 gallons, for which he assessed a penalty of $1,750. The fifth, and final, factor looks at the degree of hazard. Because corn silage is not hazardous, Landis assessed a $1,000 penalty. In

---

**2.** Section 401 of the Clean Streams Law states:

It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, *any substance of any kind or character resulting in pollution* as herein defined. Any such discharge is hereby declared to be a nuisance.

35 P.S. § 691.401 (emphasis added).

sum, these penalties totaled $5,750 for the Stambaughs' violation of Section 401 of the Clean Streams Law.

Landis then explained DEP's proposed penalty for the Stambaughs' violation of Section 402 of the Clean Streams Law, *i.e.*, their creation of a danger to the waters of the Commonwealth.[3] Landis explained that the spill matrix was also used to assess Section 402 penalties, but he did not specifically address each of the five factors. For not moving the silage in a timely manner, the Stambaughs were assessed $1,000. For their willfulness in not taking action, they were assessed $1,500. For the "potential pollution" that could have resulted from their inaction, $1,000 was assessed. R.R. 32a. In total, Landis assessed a penalty of $3,500 for the Stambaughs' violation of Section 402 of the Clean Streams Law.

Next, Landis explained DEP's civil penalty request with respect to the Stambaughs' violation of DEP's water quality regulations.

The first regulation is found at 25 Pa. Code § 91.33, and it states, in relevant part, as follows:

(a) If, because of an accident or other activity or incident, a toxic substance or another substance which would endanger downstream users of the waters of this Commonwealth, would otherwise result in pollution or cre-

ate a danger of pollution of the waters, or would damage property, is discharged into these waters—including sewers, drains, ditches or other channels of conveyance into the waters—or is placed so that it might discharge, flow, be washed or fall into them, *it is the responsibility of the person at the time in charge of the substance* or owning or in possession of the premises, facility, vehicle or vessel from or on which the substance is discharged or placed *to immediately notify the Department* by telephone of the location and nature of the danger and, if reasonably possible to do so, to notify known downstream users of the waters.

(b) In addition to the notices in subsection (a), *a person shall immediately take or cause to be taken steps necessary to prevent injury to property and downstream users of the waters* from pollution or a danger of pollution and, in addition thereto, within 15 days from the incident, shall remove from the ground and from the affected waters of this Commonwealth to the extent required by this title the residual substances contained thereon or therein.

25 Pa.Code § 91.33(a), (b) (emphasis added). For not reporting their silage leachate and not complying with DEP's November 4, 2005, order, which conduct violated

---

3. Section 402 of the Clean Streams Law states, in pertinent part, as follows:

(a) Whenever the department finds that any activity, not otherwise requiring a permit under this act, including but not limited to the impounding, handling, storage, transportation, processing or disposing of materials or substances, *creates a danger of pollution of the waters of the Commonwealth* or that regulation of the activity is necessary to avoid such pollution, the department may, by rule or regulation, require that such activity be conducted only pursuant to a per-

mit issued by the department or may otherwise establish the conditions under which such activity shall be conducted, or the department may issue an order to a person or municipality regulating a particular activity. Rules and regulations adopted by the department pursuant to this section shall give the persons or municipalities affected a reasonable period of time to apply for and obtain any permits required by such rules and regulations.

35 P.S. § 691.402(a) (emphasis added).

Section 91.33, Landis assessed a total penalty of $1,150. Landis reached this amount by applying 20% to the Stambaughs' Section 401 penalty. Landis did not explain this chosen percentage, other than to state his belief that the Stambaughs were unaware of the pollution prior to learning of the neighbors' complaints and their failure to notify DEP "didn't negatively impact what happened." R.R. 33a.

The second regulation is found at 25 Pa.Code § 91.34, and it states, in relevant part, as follows:

(a) *Persons engaged in an activity* which includes the impoundment, production, processing, transportation, storage, use, application or disposal of pollutants *shall take necessary measures to prevent the substances from directly or indirectly reaching waters* of this Commonwealth, through accident, carelessness, maliciousness, hazards of weather or from another cause.

(b) The Department may require a person to submit a report or plan for activities described in subsection (a).

25 Pa.Code § 91.34(a), (b) (emphasis added). Landis set the Section 91.34 penalty at 90% of the Section 401 penalty for a total of $5,175. Landis justified the penalty on the fact that the Stambaughs did not meet DEP's schedule in the order for moving the silage. Again, Landis did not explain how he arrived at his chosen percentage.

The penalties under Sections 401 and 402 of the Clean Streams Law and under 25 Pa.Code §§ 91.33 and 91.34 totaled $15,575. DEP argued that the $15,575 penalty should be applied twice, for each well damaged by the silage leachate, which brought the total to $31,150.

Landis then testified about DEP's request for penalties arising from the Stambaughs' failure to submit the various plans required by the November 4, 2005, order. Section 611 of the Clean Streams Law makes it unlawful not to comply with an order of DEP.[4] The plan and schedule for the temporary and permanent storage of the silage was due on November 19, 2005, two weeks after the issuance of the order. As of April 22, 2008, the day DEP filed its civil penalty complaint, it was 884 days late. DEP imposed a penalty of $1.00 per day for a total of $884.[5] The Stambaughs' nutrient management plan and their erosion and sedimentation plan were each due on December 5, 2005, thirty days after the issuance of the order. As of April 22, 2008, they were each 869 days late, resulting in an $869 penalty per plan or $1,728. The total penalties for plan delays were

4. It provides as follows
*It shall be unlawful to fail to comply* with any rule or regulation of the department or to fail to comply *with any order* or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, to cause air or water pollution, or to hinder, obstruct, prevent or interfere with the department or its personnel in the performance of any duty hereunder or to violate the provisions of 18 Pa.C.S. section 4903 (relating to false swearing) or 4904 (relating to unsworn falsification to authorities). Any person or municipality engaging in such conduct shall be subject to the provisions of sections 601, 602 and 605.
35 P.S. § 691.611 (emphasis added). Section 611 was added by the Act of October 10, 1980, P.L. 894.

5. Landis calculated the $1.00 per day penalty using the spill matrix. Landis testified that normally DEP imposes a $5.00 per day penalty for missed deadlines, but in this case chose to reduce it to $1.00 per day. He did not identify the statute or regulation that permits DEP to impose up to $5.00 per day where a person "fails[s] to comply with any order." 35 P.S. § 691.611.

$2,622. Adding these penalties to the Section 401 and 402 penalties brought the total to $33,772.[6]

George Stambaugh then testified. He explained that he and his wife have been operating their 650–acre dairy farm for over 50 years. They employ four persons full-time. In addition to tending to a herd of 250 cows, they grow and harvest hay and corn for use on the farm. In 2005, the Stambaughs' corn silage began drying out. In response, they hired a contractor who selected the site for construction of the trench silo. Stambaugh testified that he has used unlined earthen trenches over the past twenty years and never experienced a problem. He testified that he had no idea that an earthen trench silo could cause pollution to groundwater.

Stambaugh testified that when he learned that the silo was causing a problem, he told DEP he could move the silage within "a couple of weeks," provided that the "weather and everything cooperates." R.R. 108a. Stambaugh then explained that the weather did not cooperate. The trench was located in a field where there was a natural waterway; heavy rains caused the field to become extremely muddy. The first truck load of silage overturned because the truck had not been evenly loaded. The second truck became stuck in the mud. He stated that he "just had to work with the weather to get it done." R.R. 109a. Stambaugh was not sure when he succeeded in moving the silage out of the trench, but he acknowledged that he did not meet the timeline set forth in DEP's order.

With respect to the nutrient management plan, Stambaugh acknowledged the delay in its submission. He explained that his house had burned down at the end of 2005, causing him to lose records, including information about the Stambaughs' 2000 nutrient management plan that had been prepared by James Deeney. By the time Stambaugh tracked down Deeney, sometime in 2006, he learned that Deeney had been in an automobile accident and was unable to help. Stambaugh was referred to Debra Comrey, whom he met in February 2007, when they began working on the nutrient management plan. The plan was submitted in July 2007, but rejected. After several revisions, the Cumberland County Conservation District approved the plan on January 26, 2009.[7] The nutrient management plan includes a plan for the storage of silage. Stambaugh Brief at 12.

Stambaugh estimated that implementing the nutrient management plan will cost $200,000 and take three years to complete. Stambaugh testified that the erosion and sedimentation plan could not be done until after the nutrient management plan was approved. The Natural Resources Conservation Service is assisting the Stambaughs on a conservation plan. R.R. 133a. He also testified that he had paid for the treatment of his neighbors' wells and for the delivery of water until the water quality in each well was restored.

The Board concluded that the Stambaughs were liable for civil penalties. The Board agreed with DEP that the Stambaughs' violation was willful because they had been farming since 1958 and knew that silage could make its way into the

---

6. Scott R. Williamson also testified for DEP. He is chief of the assessment and planning section of DEP and Landis' supervisor. He reviewed the penalty calculation done by Landis and concurred with the result.

7. The Stambaughs claim that it took five months to prepare the plan and eighteen months for it to go through the approval process at the County Conservation District. Stambaugh Brief at 11.

neighbors' wells. Once told of the contamination, the Stambaughs promised to remove the silage within two weeks, but they did not meet that deadline. However, the Board reduced DEP's proposed penalty for the pollution incident to $15,575, reasoning that although two wells were affected, it was a single event. Adding this amount to the penalty amount DEP proposed for not submitting plans on time yielded a total penalty of $18,197, which the Board ordered the Stambaughs to pay.

■ The Stambaughs petitioned for this Court's review of the Board's adjudication. They raise two issues.[8] They first argue that DEP failed to prove that they willfully caused pollution to the waters of Pennsylvania, and the Board erred in so finding. Second, they argue that the Board failed to consider the Stambaughs' 2005 house fire and the current bad dairy farm economy, both of which made it impossible to comply with the 15 and 30–day deadlines set forth in DEP's November 4, 2005, order for submitting three plans.

■ In their first issue, the Stambaughs contend that DEP did not meet its burden of proving that their construction of the earthen silo was done recklessly. DEP did not prove "a conscious choice on the part of the violator to engage in certain conduct with knowledge that a violation will result." *Whitemarsh Disposal Corporation, Inc. v. Department of Environmental Protection*, 2000 E.H.B. 300, 2000 WL 307565, at *26 (Pa. Envtl. Hearing Bd. March 20, 2000). In response, DEP contends that the Board is the factfinder, and the evidence cannot be reweighed on appeal.

We begin with a review of the applicable statute. Section 605 of the Clean Streams Law states, in relevant part, as follows:

(a) In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act, rule, regulation, order of the department, or a condition of any permit issued pursuant to this act, the department, after hearing, may assess a civil penalty upon a person or municipality for such violation. *Such a penalty may be assessed whether or not the violation was wilful.* The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) per day for each violation. In determining the amount of the civil penalty the *department shall consider the wilfulness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost of restoration, and other relevant factors.*

35 P.S. § 691.605(a) (emphasis added). Thus, penalties may be assessed whether or not the violation was willful; however, willfulness is a factor that must be considered. In addition, the cost of restoration and other relevant factors must be considered. The penalty cannot exceed $10,000 per day per violation.

The Board's penalties under Sections 401 and 402 of the Clean Streams Law were based, at least in part, upon the finding that the Stambaughs had acted recklessly. Likewise, those penalties drove the penalties for violating the regulations in Title 25 of the Pennsylvania Code.

---

8. Our scope of review is limited to whether the Board's findings are supported by substantial evidence, whether constitutional violations occurred, and whether errors of law were committed. *Leeward Construction, Inc. v. Department of Environmental Protection*, 821 A.2d 145, 148 (Pa.Cmwlth.2003).

The Board described the Stambaughs' conduct as willful and reckless, which terms are not defined in the Clean Streams Law. When construing the meaning of a statute, words and phrases are to be construed in accordance with their common usage. *Commonwealth v. Shiffler*, 583 Pa. 478, 485, 879 A.2d 185, 189 (2005). In that regard, willfulness has been defined as "[t]he fact or quality of acting purposely or by design; deliberateness; intention" and "does not necessarily imply malice, but it involves more than just knowledge." BLACK'S LAW DICTIONARY 1737 (9th ed.2009). The word reckless has been defined as "the creation of a substantial and unjustifiable risk of harm to others and … a conscious (and sometimes deliberate) disregard for or indifference to that risk…." BLACK'S LAW DICTIONARY 1385 (9th ed.2009).

■ DEP has the burden of proving its assessment of a civil penalty by a preponderance of the evidence. *Department of Environmental Protection v. Bethenergy Mines, Inc.*, 563 Pa. 170, 176, 758 A.2d 1168, 1171 (2000). When reviewing the Board's chosen penalty amounts, "this Court may not substitute its judgment for that of the Board, and so long as the penalties reasonably fit the violations, the Board must be upheld." *Leeward Construction, Inc. v. Department of Environmental Protection*, 821 A.2d 145, 149 (Pa. Cmwlth.2003).

Landis testified that the Stambaughs were reckless in placing a large amount of corn silage in an earthen silo because they "should be aware that there was a potential to pollute." R.R. 30a. When asked why they should have been aware of the pollution potential, Landis explained

> farmers in general are aware that when they stack silage there is—leachate is produced and that's why a lot of farms have leachate containment where they

actually collect that leachate and pump it somewhere else so it does not contaminate the environment.

R.R. 61 a. Landis acknowledged that he did not ever hear George Stambaugh state that he had this knowledge. The only other evidence on this issue came from Stambaugh. He testified that he had used earthen trench silos on his property for twenty years without any problem. Stambaugh testified, unequivocally, that he did not know a silage trench could cause pollution. It appears that the Stambaughs' contractor, who chose the site, also did not know of the risk.

The Board may reject the testimony of Stambaugh as not credible, but its finding of willfulness must be based on substantial evidence. *Leeward Construction, Inc.*, 821 A.2d at 149 n. 3. Landis' testimony that farmers, in general, know that silage can cause contamination is not substantial evidence on which the Board can find that the Stambaughs acted willfully and recklessly. First, Landis cannot possibly know what is in the mind and experience of each and every farmer in Pennsylvania. Second, a statement of what farmers generally know does not prove what two individual farmers, *i.e.*, the Stambaughs, actually knew. Finally, there was no evidence presented that the Stambaughs knew of the existence of the neighboring wells or the risk presented to their water quality by the trench silo. In short, the record lacks evidence to support a finding that the Stambaughs knew their actions would cause a risk of pollution and did so in wanton disregard of that risk.

■ The Board's penalty under Section 402 of the Clean Streams Law, *i.e.*, for not removing the silage within two weeks, also included a factor for willfulness. Stambaugh agreed that the silage was not moved within the two-week timeframe or within the fifteen days provided for in DEP's order. Stambaugh did not remem-

ber when he actually completed the job. However, he asserted that the delay was caused by the weather. The Board is free to accept or reject the testimony of Stambaugh. However, the Board did not explain its reasons for finding that Stambaugh willfully delayed in moving tons of silage.

With respect to the penalties imposed for late plan filings, the Board did not address the Stambaughs' reasons, i.e., the fire and the poor economy, for not submitting a nutrient management plan in a timely manner. Further, the Stambaughs argued that it was impossible to submit a nutrient management plan within the thirty-day period set forth by DEP and that while there was some delay, a plan has been approved. The Board found that "[t]he Stambaughs did not submit a nutrient management plan until July 23, 2007, approximately three years after [DEP's] Order." Board Adjudication at 4; Finding of Fact 29. DEP's order was issued on November 4, 2005. This period of time encompasses eighteen months, not "approximately three years."

The Board provided no justification for the penalties awarded due to plan delays. The Board needs to explain why the Stambaughs' defenses that the plans were incapable of completion in the prescribed fifteen and thirty-day deadlines carried no weight. The Board also needs to explain whether it believed that the Stambaughs' delay was willful.

The Board imposed the plan delay penalties as of April 22, 2008, the date DEP first assessed a civil penalty against the Stambaughs. The Board made no findings about why it selected that specific date. It did not explain whether the Stambaughs should continue to be fined even after they

had hired a professional to prepare the plans or during the period of time the plans were submitted, but not yet approved. DEP's order required the submission of plans by a certain date, but not their approval.

We hold that the evidence does not support the Board's findings that the Stambaughs' violations of the Clean Streams Law were willful and reckless. Because this conclusion raises multiple issues as to the proper calculation of the penalty assessment, we vacate the penalty assessment and remand the matter to the Board for it to reevaluate and recalculate the penalty in accordance with this opinion.[9]

### ORDER

AND NOW, this 10th day of December, 2010, the order of the Environmental Hearing Board dated September 17, 2009, in the above-captioned matter is VACATED and REMANDED in accordance with the foregoing opinion.

Jurisdiction relinquished.

---

9. In their second allegation of error, the Stambaughs argue that the Board failed to consider the reasons they provided for failing to comply with DEP's deadlines. As the Board failed to address, in its opinion, whether any of the Stambaughs' reasons for delay were valid, it should also consider this issue on remand.