**[J-86-2017] [MO:Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY, | : | No. 6 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at 485 MD 2014, |
| | : | dated January 11, 2017 |
| v. | : | |
| | : | ARGUED: November 28, 2017 |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellant | | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE DONOHUE**                                **DECIDED: March 28, 2018**

I join in Section II.A of the learned Majority's Opinion, as I agree that the Commonwealth Court strayed too far afield of the pleadings, applications for relief and arguments of the parties with respect to sections 307 and 401 of the Clean Streams Law, 35 P.S. §§ 691.1 - 691.1001 ("CSL"), and thus those portions of its decision should be vacated. I also join in Section II.C of the Majority Opinion, as I agree that the contours of civil penalty liability with respect to the migration of contamination through soil to water are not in focus before us and thus should not be addressed.

However, I depart from the Majority's determination in Section II.B that section 301 of the CSL is ambiguous, and its conclusion that section 301 applies only to the initial placement or discharge of industrial wastes into any of the waters of the Commonwealth.

In my view, the Majority's interpretation of section 301 is overly restrictive and not faithful to the actual language of the provision, which is as follows:

> No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes[.]

35 P.S. § 691.301.

In reaching its conclusion that section 301 is ambiguous,[1] the Majority describes the statute as "inexplicit" with regard to "whether, or to what degree, [the operative terms and phrases] may encompass movement beyond the realm of human direction or control." Majority Op. at 28. While it may be true that section 301 is inexplicit in this regard, it is also entirely irrelevant to the issue presented here, i.e., whether a discrete violation of section 301 occurs when a person (as defined in the CSL), after an initial placement or discharge of industrial wastes into any of the waters of the Commonwealth, permits that industrial waste to continue to flow into any of the other waters of the Commonwealth. On this issue, section 301 is unambiguous.

Section 301's explicit prohibition against "continu[ing] … to permit to flow" can only be read to bar specific conduct, namely that of a person who, with knowledge of its placement or discharge of industrial waste into any of the waters of the Commonwealth, permits the continued flow of that industrial waste into any of the other waters of the Commonwealth. To "permit" the continued flow of industrial waste into any of the waters

---

[1] Our object in statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). Further, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Courts may apply the rules of statutory construction only when the statutory language is not explicit or is ambiguous. *Tr. Under Agreement of Taylor*, 164 A.3d 1147, 1155 (Pa. 2017) (citing 1 Pa.C.S. § 1921(c)).

of the Commonwealth is prohibited conduct, as one must have knowledge of its occurrence and yet fail to take action to stop it. Thus, it is a violation of section 301 to place, discharge or otherwise permit industrial wastes to flow into any of the waters of the Commonwealth, and it is a separate violation of section 301 to permit that same industrial waste to flow into any of the other waters of the Commonwealth without taking action to stop it.[2]

Instead of affording the language of the statute its obvious meaning, the Majority, having found a lack of explicitness, proceeds to conclude that the most natural reading of section 301 is that it prohibits only discharges "from the point of the initial release and entry into water." Majority Op. at 29, 32. I take issue with this "most natural reading" of section 301 for two reasons. First, the Majority based this interpretation primarily on a 2002 decision by a California intermediate appellate court. *Consumer Advocacy Grp., Inc. v. Exxon Mobil Corp.*, 128 Cal.Rptr.2d 454 (2002). In *CAG*, the California Court of

---

[2] I acknowledge DEP's recitation of section 605 of the CSL, which provides that civil penalties may be imposed "whether or not the violation was wilful," 35 P.S. § 691.605(a), in support of its contention that the CSL (including section 301) is a strict liability statute. DEP's Brief at 34. In my view, DEP conflates the mens rea requirements for violations of specific provisions of the CSL with its authority to impose civil penalties for violations of the CSL. Contrary to DEP's assertion, section 605 does not compel us to read section 301 as a strict liability provision, as DEP's position does not account for the "continu[ing] … to permit to flow" language in section 301.

Instead, in construing the language "continu[ing] … to permit to flow" in section 301, I agree with EQT that the passive migration of industrial wastes into successive waters of the Commonwealth is not, in and of itself, a basis for multiple violations. EQT's Brief at 32. Rather, a violation of section 301 depends upon the actions or inactions of those who introduced pollutants into the waters of the Commonwealth. Specifically, violations occur when a person **permits** the continued flow of industrial wastes into successive waters of the Commonwealth. As explained hereinabove, permitting the continued flow of contaminants without taking action to stop it is **conduct** prohibited by section 301.

Appeals held, based on dictionary definitions, that the terms "discharge" and "release" refer to "movement from a place of confinement to another place where there is no confinement," and do not connote "simply movement from one point to another." *Id.* at 459-60. The court then, again using dictionary definitions, explained that the terms "dumping" and "putting" convey "the action of placing toxic chemicals into the drinking water." *Id.*

These rulings, whether right or wrong,[3] were made in circumstances vastly different from those present in the case sub judice, and do not, in any significant respect, provide any support for the Majority's "most natural reading" of section 301. The intermediate appellate court in *CAG* was attempting to interpret the language of a ballot initiative passed by California voters, which prohibited the "discharge or release" of cancer-causing chemicals into water or onto land.[4] *Id.* at 455. In interpreting a ballot initiative, the court was tasked with discerning the intent of the voters, which in turn also required consideration of the ballot summary and the arguments presented to the voters set forth therein. *Id.* at 459. These ballot summary arguments included statements like "don't put these chemicals into our drinking water," and "stop dumping extremely

---

[3] It does not appear that the definitions set forth in *CAG* have ever been adopted by any non-California court. In a recent decision, the Supreme Court of Rhode Island expressly refused to do so. In interpreting a Rhode Island statute that prohibited "permitting the discharge of oil," that court rejected a defendant's contention that the ruling in *CAG* should be followed, ruling that "[n]otwithstanding the construction injected upon the California statutory scheme by its courts, we decline to adopt a similar construction to the Rhode Island [statute]." *Power Test Realty Co. Ltd. Partnership v. Coit*, 134 A.3d 1213, 1224 n.12 (R.I. 2016)

[4] "No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water...." *CAG*, 128 Cal.Rptr.2d at 455.

dangerous chemicals" in the water. *Id.* The *CAG* court, as noted above, concluded that all of the relevant terms (discharge, release, put and dump) conveyed active concepts, and thus the ballot initiative did not intend to impose liability for the passive migration of chemicals that had already been released or discharged. *Id.* at 460.

As explained supra, the issue in this case is not passive migration, but rather the failure to remediate and, in so doing, permit the continued flow of industrial wastes into any of the waters of the Commonwealth. Unlike in *CAG*, we are not attempting to divine the intent of voters to a ballot initiative, but rather are interpreting the language of a statute enacted by our General Assembly. Most importantly, in *CAG* neither the ballot initiative nor the ballot summary contained the language critical to this present appeal ("continu[ing] … to permit to flow"). Absent any such language, the court in *CAG* did not decide, or even address, the issue presently before this Court. As such, even if correct, *CAG* provides no support for the Majority's determination that section 301 prohibits only discharges "from the point of the initial release."

Second, the Majority's decision to limit the scope of section 301 to the "initial release" of industrial wastes is not only not the "most natural reading" of section 301, it is fundamentally inconsistent with the language of the statute. The words "initial" and "release" do not appear in section 301, and both are at odds with the phrase "continu[ing] … to permit to flow." Section 301 prohibits both an "initial release" of industrial wastes and also prohibits a person from permitting the flow of those industrial wastes to continue. The Majority's attempt to harmonize this inconsistency fails. In support of its preferred interpretation, the Majority insists that "once contaminants no longer pass through the initial point of entry into water, it is reasonable to say that the substances are no longer

being released into any of [the] waters of the Commonwealth on that pathway." Majority Op. at 29. In other words, once the discharge of contaminants at the initial point of entry ceases, the violation of section 301 concludes. In then attempting to incorporate the "continu[ing] … to permit to flow" language, the Majority insists that permitting a continued flow of contaminants into Pennsylvania waters would constitute a continuing, rather than a discrete, violation. *Id.* at 29 n.19. It is not readily apparent, however, how there could be a continuing violation if the violation has concluded.

The Majority's "from the point of the initial release" interpretation treats the "continu[ing] … to permit to flow" language in section 301 as mere surplusage, which is not permissible under basic statutory construction principles. *See, e.g., Burke by Burke v. Independence Blue Cross*, 174 A.3d 252, 260 (Pa. 2017); *see also* 1 Pa.C.S. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."). Indeed, the "continu[ing] … to permit to flow" language in section 301 could be eliminated from the statute entirely, with no effect on the Majority's interpretation of the provision. The General Assembly did not specify that the industrial waste must flow from **outside** the waters of the Commonwealth into the waters of the Commonwealth, nor did it prohibit only an initial release of industrial wastes. Instead, the legislature prohibited persons and entities from "continu[ing] … to permit [industrial wastes] to flow into any of the waters of the Commonwealth." 35 P.S. § 691.301.

The Majority also contends that section 301 is ambiguous regarding whether it "prevent[s] movement into any discrete water or part, thereby also protecting the other waters at large, or if it wished to serially sanction movement among waters (and their parts) after the fact of an initial violation." Majority Op. at 32. This conclusion overlooks,

without explanation, that the General Assembly clearly defined the "waters of the Commonwealth" broadly "to include any and all rivers, streams, creeks, … and all other bodies or channels of conveyance of surface and underground water, or parts thereof[.]" 35 P.S. § 691.1. By virtue of this definition, the CSL protects all bodies of water, large and small, as it provides an expansive list of the types of "waters" protected. Such a definition is thoroughly consistent with the goal of the broad protection of all of the Commonwealth's waters.

My reading of the statute is supported by EQT's recognition that the term "into" references the movement from one water to another. EQT's Brief at 14, citing Webster Dictionary, http://www.webster-dictionary.net/definition/into (defining "into" as a preposition and illustrating its meaning, *inter alia*, as "one stream falls or runs into another"). *See also* 1 Pa.C.S. § 1903 ("[w]ords and phrases shall be construed according ... to their common and approved usage"). Thus, pursuant to the common and approved usage of the words of the statute, as acknowledged by EQT, section 301 protects every waterway of the Commonwealth and protects, by the imposition of sanctions, the release of industrial waste from one type of water "into" any other type of water, regardless of where it originates.

The Majority's interpretation of section 301 is clearly aimed at protecting against limitless penalties for pollution, but in my view, it does so at the expense of abating pollution. The Majority's principal concern appears to be the "scale of the penalty exposure" implicated by the DEP's interpretation of section 301, as the Majority states that the General Assembly, had it intended this sort of "massive civil penalty exposure, … would have said so more expressly." Majority Op. at 32-33. It is not the role of this

Court, however, to second-guess and/or limit the scope of penalties imposed by the General Assembly. Instead, our focus must be confined to interpreting penalty provisions in accordance with the rules of statutory interpretation. In this regard, I note that the Commonwealth Court has acknowledged that litigants may challenge any penalties imposed pursuant to section 301 of the CSL on the grounds that they do not "reasonably fit the violations." *See Stambaugh v. Dep't of Envtl. Prot.*, 11 A.3d 30, 37 (Pa. Commw. 2010); *Pines at W. Penn, LLC v. Dep't of Envtl. Prot.*, 24 A.3d 1065, 1070 (Pa. Commw. 2011) (providing that the "Board's decision must be upheld provided that the penalties reasonably fit the violations" and that "[a] penalty would not reasonably fit a violation where it 'would strike at one's conscience as being unreasonable …'"). Thus, the unambiguous language of section 301 need not be ignored or contorted in an effort to promote the imposition of proportional penalties.

For these reasons, I join in Sections II.A and II.C of the Majority Opinion. I dissent from its holdings in Section II.B.

Justice Dougherty joins this concurring and dissenting opinion.